RECEIPT #_____
AMOUNT $.150_____
SUMMONS ISSUED.420_____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. *TOM*_____
DATE. 6/21/04_____

FILED
IN CLERKS OFFICE

2004 JUN 21  P 4: 12

U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO.

| | |
|---|---|
| VICTORIA C. PATTISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE HERTZ CORPORATION | ) |
| WELFARE PLAN, THE HERTZ | ) |
| CORPORATION, AND | ) |
| METROPOLITAN LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendants | ) |
| | ) |

**COMPLAINT**

04-11408 DPW

MAGISTRATE JUDGE *Alexander*

## INTRODUCTION

1.   Plaintiff, Victoria Pattison ("Ms. Pattison"), brings this action against the defendants, The

Hertz Corporation Welfare Plan ("Plan"), the Hertz Corporation ("Hertz") and

Metropolitan Life Insurance Company ("MetLife") (collectively referred to as

"Defendants") for violation of the Employment Retirement Income Security Act of 1974,

as amended, 29 U.S.C. §§ 1001 *et. seq.* ("ERISA").  Ms. Pattison is a participant in an

ERISA welfare benefit plan that is underwritten and insured by MetLife.  The Policy

Number is 102227-G.  The Employer Identification Number and Plan Number are 13-

1938568 and 505 respectively.

2.   This Complaint challenges the Defendants': 1)  unlawful denial of Ms. Pattison's long-

term disability ("LTD") income benefits despite the substantial medical evidence

demonstrating Ms. Pattison's qualifications for said benefits, thereby depriving Ms.

1

Pattison of the appropriate LTD benefits due to her under the Policy; and 2) The Defendants' failure to provide Ms. Pattison with a full and fair review of her claim for benefits.

3.    Ms. Pattison is filing this action to recover benefits due under the Plan, to enforce the present rights existing therein, to clarify rights under the terms of the Plan, and to recover costs and attorneys' fees as provided by ERISA.

## JURISDICTION

4.    This court has personal and subject matter jurisdiction over this case under 29 U.S.C. § 1132(e)(2) and (f), without regard to jurisdictional amount or diversity of citizenship, in that the Plan is administered in this district.

## PARTIES

5.    Ms. Pattison is a 49-year-old individual who currently resides in North Pembroke, Massachusetts. Ms. Pattison is a vested participant in a MetLife employee benefit plan, within the meaning of 29 U.S.C. § 1002(2)(7). Ms. Pattison has standing to bring this action under 29 U.S.C. § 1132(a).

6.    The defendant, The Hertz Corporation Welfare Plan, is a "long-term disability plan" issued by Hertz and maintained continuously thereafter by MetLife.

7.    The defendant, The Hertz Corporation, is a for-profit corporation, with its principal place of business at 225 Brae Boulevard, Park Ridge, New Jersey, 07656-0713. Hertz transacts business in Massachusetts. Hertz Corporation is the Plan Administrator of the Plan under which Ms. Pattison is suing.

8.    The defendant, Metropolitan Life Insurance Company, is a for-profit corporation, with its

principal place of business at One Madison Avenue, New York, NY, 10010-3690.

MetLife transacts business in Massachusetts and is the Claims Administrator of the Plan

under which Ms. Pattison is suing.

## STATEMENT OF FACTS

**Insurance Entitlement, Discretion**

9.      In August 1980, Ms. Pattison began working as a Clerk Supervisor at The Hertz

Corporation ("Hertz") in Braintree, Massachusetts.

10.     Ms. Pattison worked at Hertz for 21 years before becoming disabled due to the

debilitating symptoms of Multiple Sclerosis ("MS).

11.     Ms. Pattison was a Hertz employee when she became disabled to due MS.

12.     As an employee of Hertz, Ms. Pattison was provided with LTD benefits under a contract

of insurance between Hertz and MetLife.

13.     MetLife insurers and funds the Plan under which Ms. Pattison is suing.

14.     MetLife is the claims administrator for the Plan under which Ms. Pattison is suing.

15.     Hertz is the Plan Administrator for the Plan under which Ms. Pattison is suing.

16.     The Plan terms do not provide Hertz with the discretion to interpret the terms of the Plan

or to determine eligibility for benefits thereunder.

**Definitions of Disability**

17.     Throughout its review of Ms. Pattison's claim, MetLife applied differing Plan definitions

of disability to evaluate Ms. Pattison's eligibility for benefits.

18.     In its March 28, 2002 denial letter, MetLife defined "total disability" as follows:

(Disabled or Disability means that, due to sickness, pregnancy or accidental

3

injury, you are receiving Appropriate Care and Treatment from a Doctor on a
continuing basis; and During the first 24 months, including your Elimination
Period, you are unable to earn more than 80% of your Predisability Earnings or
Indexed Predisability Earning (sic) at your Own Occupation for any employer in
your Local Economy)

19.     On June 21, 2002, in response to a request by Ms. Pattison's counsel for a copy of the

Plan, MetLife stated:

Please be advised that as a MetLife policy we do not provide copies (sic) policies
to claimants, attorneys or any third parties and have to direct you to contact the
benefits representative for the Hertz Corporation in order to obtain a copy (sic)
Ms. Pattison's benefit handbook.

20.     In its October 16, 2002 denial letter, MetLife quoted the Plan terms discussing total

disability as follows:

"Disabled" or "Disability" means that due to sickness pregnancy or accidental
injury, you are receiving Appropriate Care and Treatment from a Doctor on a
continuing basis; and

1.      During the first 24 months, including your Elimination
Period, you are unable to earn more than 80% of your
Predisability Earnings, or Indexed Predisability Earnings at
your Own Occupation for any employer in your Local
Economy; or

2.      After the first 24 months period, you are unable to earn
more than 60% of your Indexed Predisability Earnings from
any employer in your Local Economy at any gainful
occupation for which you are reasonably qualified taking
into account your training, education, experience and
Predisability Earnings.

21.     On January 4, 2003, new counsel for Ms. Pattison wrote LaQuenta Pierre of Hertz

requesting a copy of Ms. Pattison's Plan.

22.     On January 9, 2003, counsel for Ms. Pattison received a copy of Hertz Corporation's

Summary Plan Description. The Summary Plan Description indicates the following with

4

respect to benefit eligibility:

**Benefit Duration**

During the first two years of your disability, you may receive benefit payments from this Plan if you are unable to perform your regular job. If you are still totally disabled after two years from the initial date of disability, you may continue to qualify for benefits. However, to qualify, you must be unable to perform any job for which you are qualified by education, training or experience. This will be determined by the insurance company.

23.    On January 13, 2003, counsel for Ms. Pattison wrote Ms. Pierre requesting a complete

copy of the Plan, as originally requested in Ms. Pattison's January 4, 2003 letter, and not

simply the Summary Plan Description.

24.    On January 31, 2002, Ms. Pierre wrote counsel for Ms. Pattison enclosing a copy of The

Hertz Corporation's Long-Term Disability Contract with MetLife. Ms. Pierre requested

$9.25 for the copying of this document in her January 31, 2003 letter.

25.    The Plan document released by Hertz in its January 31, 2002 letter defines disability as

follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury,

1. you cannot perform each of the material duties of your regular occupation; and

2. after benefits under this policy have been paid for 18 months and you cannot perform each of the material duties of any gainful occupation for which you are reasonably fit by training, education or experience.

26.    In her November 10, 2003 letter, Laura Sullivan, MetLife's Business Consultant cited the

definition of disability indicated in MetLife's October 2002 denial letter.

27.    There exists a substantial conflict between the Plan definition of disability provided by

MetLife and Hertz.

**Ms. Pattison's Claim For LTD Benefits**

28.     Ms. Pattison became disabled due to the debilitating symptoms of MS in November 2000.

        Ms. Pattison received Short Term Disability ("STD") for six months subsequent to her

        date of disability.  Ms. Pattison's STD benefits ended on May 12, 2002.

29.     Ms. Pattison has presented a timely claim to MetLife, asserting that she is an insured

        person, that she became disabled while insured, and that she is entitled under the Plan to

        LTD benefits for the period of time beginning November, 2002, and continuing thereafter

        without interruption through to the present, and continuing in the future until she reaches

        the age of 65 or is no longer disabled.

**Illness/Basis for Disability**

30.     In September 1997, Ms. Pattison was diagnosed with MS by Dr. Paul Blachman, a Board

        Certified Neurologist.  Dr. Blachman began seeing Ms. Pattison on September 23, 1997,

        when she was admitted to South Shore Hospital due to neck pain and difficulty walking.

        Ms. Pattison complained of weakness in both legs and her right hand, the onset of which

        occurred four to five days prior and had progressively worsened until she was admitted to

        South Shore Hospital.

31.     Dr. Blachman performed an MRI study on Ms. Pattison and found two large lesions in

        her cervical spinal cord, the appearance of which Dr. Blachman stated was, ". . . highly

        suggestive of multiple sclerosis and I feel that is the cause of the patient's

        symptomatology." Dr. Blachman confirmed Ms. Pattison's final diagnosis as Multiple

        Sclerosis in his September 25, 1997, discharge summary for Ms. Pattison from South

Shore Hospital.

32.    In order to treat Ms. Pattison's symptoms, Dr. Blachman prescribed Ms. Pattison various

treatments including Prednisone, supplemental dietary potassium, physical therapy,

Avonex, Amantadine, and Naprosyn. While these medications provided some

improvement in Ms. Pattison's symptoms, she continued to suffer from the exacerbating

effects of her MS.

33.    While employed at Hertz, Ms. Pattison's symptoms from MS and from the side-effects of

her medication affected her ability to perform at work. Ms. Pattison felt constantly

fatigued and was unable to concentrate. She had problems driving to work, and often had

to pull over to the side of the road multiple times during her trip for approximately ten

minutes at a time due to dizziness.

34.    Ms. Pattison's position at Hertz also necessitated physical labor including moving files

from the examiners to managers for review, bending, lifting storage boxing. Ms.

Pattison's symptoms affected her ability to perform the physical symptoms of her

occupation.

35.    Ms. Pattison also experienced blurry vision while working at the computer and memory

loss. For example, Ms. Pattison was assigned to payroll on Friday afternoons and would

often forget to process the payroll. Also, if someone would call Ms. Pattison at Hertz, she

would often forget who called or what she had told him or her.

36.    On February 29, 2000, Dr. Blachman stated that, "The patient currently works full-time

and I feel that working full-time is contributing to the prominent symptomatology,

especially toward the evening. I, therefore, recommend that this patient apply for

7

disability, at least on a temporary basis."

37.    On April 22, 2000, Dr. Blachman stated in his medical notes, "I feel she [Ms. Pattison] should switch from working full-time to part-time."

38.    Finally, on October 17, 2000, Dr. Blachman stated in his medical notes, "I gave her a note indicating that I would recommend that she be placed on long term disability at work."

39.    Although driving to work and completing a full day was difficult and dangerous for Ms. Pattison, she continued to work until November 10, 2000, when Hertz received Dr. Blachman's note and asked Ms. Pattison to leave the premises for fear that Ms. Pattison would injure herself on the job.

40.    On June 11, 2001, Dr. Blachman reported that Ms. Pattison's symptoms remained unchanged as of September 5, 2000.

41.    In December 2001, Dr. Blachman listed Ms. Pattison's symptoms as including, "fatigue, earaches, shortness of breach, diarrhea, constipation, heartburn, memory loss, anxiety, frequent urination, incontinence, joint pain, back pain, difficulty walking, headaches, light-headedness, tingling, speech difficulty, etc. . . Overall, this patient is stable with regard to multiple sclerosis."  Further symptoms included spastic gait, hyperreflexia in the legs, and bilateral Babinskis.

42.    Dr. Blachman stated in his April 9, 2002, medical note, "Her [Ms. Pattison's] disability was recently terminated because of lack of documentation of deficits.  The physician who reviewed her claim did not have access to her office visit notes and nevertheless terminated the disability.  I feel this is a gross injustice and I informed the patient and MetLife of my opinion in this regard."

8

43.    On February 19, 2003, Dr. Howard Lee Weiner, a professor of Neurology at the Harvard

Medical School and head of the Multiple Sclerosis Center at the Brigham & Women's

Hospital, saw Ms. Pattison at the request of Dr. Blachman, in order to obtain an

independent evaluation of Ms. Pattison's condition. Dr. Weiner's assessment was that

Ms. Pattison, "has worsened with her MS and perhaps is entering a slow progressive

phase."

44.    As a result of the debilitating effects of MS, Ms. Pattison currently is unable to perform

the duties of her regular occupation or any occupation.

**Application for Benefits**

45.    Realizing that she was totally disabled from performing the material and substantial

duties of her regular occupation as a result of her MS, Ms. Pattison submitted a claim for

long-term disability ("LTD") benefits under her Plan in March 2001, with a disability

onset date of November 2000.

46.    Ms. Pattison suffered through the progressive symptoms of MS for over three years

before applying for disability benefits.

**Approval for Benefits**

47.    On April 6, 2001, MetLife approved Ms. Pattison's application for LTD benefits

beginning on May 12, 2001. MetLife also informed Ms. Pattison that medical updates

would be required throughout management of her claim.

**Social Security Disability Insurance**

48.    In May 2001 Ms. Pattison filed a claim for Social Security Disability Insurance. In

October 2001, the Social Security Administration granted Ms. Pattison Social Security

Disability Insurance due to the debilitating symptoms of MS.

49.   The Social Security Administration determined that Ms. Pattison became disabled under

their rules on March 1, 2001.  As such, Ms. Pattison was entitled to monthly disability

benefits beginning August 2001.

50.   Ms. Pattison continues to receive disability benefits from the Social Security

Administration.

**Termination of Benefits and Internal Appeal**

51.   On March 28, 2002, Ms. Pattison received a letter from MetLife informing Ms. Pattison

that her LTD benefits would be withdrawn effective March 28, 2002.  The basis for this

termination was a record review conducted by Dr. Amy Hopkins.

52.   On January 15, 2002, MetLife referred Ms. Pattison's file to a Dr. Hopkins for

consultation.  Dr. Hopkins determined upon a review of Ms. Pattison's claim file that her

condition of Multiple Sclerosis did not preclude her from performing her own job or any

occupation.

53.   Dr. Hopkins is certified in Internal Medicine and does not specialize in Neurology.

54.   Dr. Hopkins failed to review Ms. Pattison's complete medical record prior to performing

a review of her claim.

55.   Dr. Hopkins did not contact Dr. Blachman prior to making a determination regarding Ms.

Pattison's disability.

56.   Ms. Pattison contacted Dr. Blachman following receipt of MetLife's termination letter.

On April 5, 2002, Dr. Blachman wrote a letter to MetLife stating that he strongly

10

disagreed with Dr. Hopkins' evaluation. He described, at length, his substantive medical notes describing documentation of Ms. Pattison's disability. Dr. Blachman also informed MetLife that he had advised Ms. Pattison to apply for LTD benefits.

57. Dr. Blachman also stated in his letter to MetLife that ". . . Dr. Hopkins could not possibly have performed an adequate assessment without the availability of the office notes. . . It is easier to simply deny a claimant's disability than to make a phone call in order to expand upon missing office visit notes."

58. Following receipt of her termination of LTD benefits by MetLife, Ms. Pattison, through counsel, appealed MetLife's decision on August 1, 2002. This letter was received by MetLife on August 8, 2002.

59. On September 12, 2002, Dr. Robert Porter, a Board Certified emergency medicine and occupational medicine specialist, reviewed Dr. Hopkins report of February 11, 2002, and Dr. Blachman's response letter of April 5, 2002, at the request of MetLife.

60. Robert Porter, M.D., is the president of Network Medical Review ("NMR") a company having its principal place of business in Rockford, Illinois.

61. On information and belief, NMR is frequently utilized by MetLife to conduct reviews of claims.

62. On information and belief, MetLife's relationship with NMR is not an independent one.

63. In his report, Dr. Porter affirmed Dr. Hopkins' review of Ms. Pattison's claim file, despite Dr. Hopkins' failure to review Ms. Pattison's complete medical history.

64. Dr. Porter further negated Dr. Blachman's medical opinion regarding Ms. Pattison's condition, which encompassed five years of treatment of Ms. Pattison's MS as well as a

11

report by Dr. Weiner, the head of the Multiple Sclerosis Center at Brigham & Women's Hospital, testifying to the worsening of Ms. Pattison's MS since her diagnosis in 1997.

65.     On October 16, 2002, MetLife upheld its March 28, 2001 termination of Ms. Pattison's LTD benefits. MetLife reasoned that Ms. Pattison's medical records did not support her inability to perform sedentary work.

66.     On November 13, 2002, Ms. Pattison, through subsequent counsel, informed MetLife of Ms. Pattison's new representation and requested a complete copy of MetLife's claim file relating to Ms. Pattison.

67.     MetLife failed to respond to Ms. Pattison's request for a copy of her claim file.

68.     On December 20, 2002, Ms. Pattison reiterated her request for a copy of her claim file.

69.     MetLife failed to respond to Ms. Pattison's request for a copy of her claim file.

70.     On January 6, 2003, Ms. Pattison requested her claim file for a third time.

71.     On March 6, 2003, four months after Ms. Pattison began requesting her claim file, MetLife informed Ms. Pattison that it was in receipt of the three claim file requests on November 13, 2002, December 20, 2002, and January 6, 2002, but required a release of information from Ms. Pattison in order to release a copy of her claim file.

72.     Ms. Pattison did not receive a copy of her claim file until June 6, 2003, seven months following her initial request for the materials.

73.     On January 20, 2003, Ms. Pattison underwent vocational testing through Paul R. Blatchford, Ed.M., an independent vocational expert, in order to have her functional limitations and restrictions assessed.

74.     Mr. Blatchford evaluated Ms. Pattison via a series of tests designed to measure the

12

aptitudes and or skills of occupations that met the standards set forth by the United States

Department of Labor, outlined in the Dictionary of Occupational Titles, Revised 4th

Edition, Vol. I.II., The McCroskey MCDOT 2001, Selected Characteristics of

Occupations, and The Revised Handbook for Analyzing Jobs to determine Ms. Pattison's

capacity to perform work as of November 10, 2000, her date of disability.

75.    Mr. Blatchford concluded after his examination, "It is my opinion, based upon a review

of medical records provided, results of standardized vocational, and my independent

evaluation of her, that Mrs. Pattison does not possess the residual functional capacity of a

vocational nature to perform or sustain her past relevant work at the Hertz Corporation as

a Clerk, or Clerical Supervisor." Mr. Blatchford further stated, "Mrs. Pattison, would in

my opinion be unable to perform, and more importantly sustain, any and all entry-level

sedentary unskilled exertional occupations."

76.    At no time during its review of Ms. Pattison's case did MetLife conduct a vocational

review of Ms. Pattison, her occupation, or her ability to sustain full-time employment.

77.    On June 13, 2003, through counsel, Ms. Pattison appealed her termination of LTD

benefits by MetLife. In this appeal, Ms. Pattison included her personal affidavit, her

husband's affidavit, Dr. Weiner's independent medical report of February 19, 2003, Dr.

Weiner's credentials, Dr. Blachman's medical report of April 5, 2003, and April 10,

2003, updated medical records from her treating physicians and the vocational report of

Paul Blatchford.

78.    On June 24, 2003, MetLife upheld the original determination to terminate Ms. Pattison's

LTD benefits. MetLife stated, in part, "Because your client has exhausted all

13

administrative rights to appeal under the law, no further file reviews will be conducted, and no additional medical information submitted will be reviewed."

79.    On July 15, 2003, Ms. Pattison wrote a letter to the Chief Executive Officers of MetLife and Hertz a letter indicating that Ms. Pattison intended to exercise her rights under ERISA, but wished to provide both MetLife and Hertz with notice of her claims and the ability to resolve the matter prior to doing so.

80.    On July 25, 2003, MetLife responded to Ms. Pattison's letter by requesting that Mr. Pattison refrain from litigation until MetLife had an opportunity to review the claim file.

81.    On August 15, 2003, MetLife informed Ms. Pattison that MetLife was willing to conduct one further review of her claim.

82.    On August 25, 2003, MetLife requested that Ms. Pattison undergo another Independent Medical Examination ("IME") in order to verify Ms. Pattison's condition.  On August 26, 2003, in response to this request, Ms. Pattison indicated to MetLife that she had already undergone an IME prior to the June 13, 2003 appeal.  In particular, Ms. Pattison was seen by Dr. Weiner, a professor of Neurology at the Harvard Medical School and the head of the Multiple Sclerosis Center at the Brigham and Women's Hospital.

83.    Ms. Pattison further advised MetLife in their August 26, 2003, letter that Dr. Weiner was not a part of Dr. Blachman's, Ms. Pattison's treating neurologist's, hospital, Ms. Pattison's counsel did not select Dr. Weiner, and Ms. Pattison's insurance paid for the IME.  Therefore, Dr. Weiner's IME was the most independent, expert opinion regarding Ms. Pattison's functional abilities.

84.    On August 26, 2003, MetLife informed counsel for Ms. Pattison that Dr. Weiner's IME

14

was a subjective review of Ms. Pattison's claim and not an IME.

85.    On August 26, 2003, counsel for Ms. Pattison wrote counsel for MetLife indicating that

Dr. Weiner's IME was independent and that Dr. Weiner conducted a thorough

examination of Ms. Pattison, and rendered objective evidence of her illness and

limitations.

86.    Then, on August 29, 2003, MetLife informed Ms. Pattison that Dr. Weiner could not be

considered an independent examiner as he was selected by Ms. Pattison's treating

physician to conduct the independent medical examination. MetLife further indicated

that it would only consider a medical examination to be independent if chosen by a

MetLife- selected and approved examiner.

87.    At no time during its administrative review of Ms. Pattison's claim did MetLife request

that Ms. Pattison undergo an IME. MetLife's first request for an IME came one and a

half years after it first denied Ms. Pattison's claim.

88.    MetLife failed to adequately explain why it was necessary to conduct an IME one and a

half years after it denied Ms. Pattison's claim, when it was mandated under ERISA to

conduct a thorough investigation before denying Ms. Pattison's claim.

89.    MetLife failed to provide Ms. Pattison with a reasonable reason for rejecting Dr.

Weiner's examination results, which clearly answered the questions regarding the

progression of Ms. Pattison's illness as well as the sufficiency of her treatment.

90.    On October 3, 2003, Ms. Pattison informed MetLife that she would proceed to exercise

her litigation rights under ERISA.

91.    On November 10, 2003, MetLife upheld its determination to terminate Ms. Pattison's

LTD benefits.

**MetLife's Review of Ms. Pattison's Claim for Benefits**

92.    MetLife's sole reliance upon Drs. Hopkins' and Porter's review of Ms. Pattison's claim

to deny Ms. Pattison's benefits constitutes an abuse of discretion under ERISA.

93.    MetLife's reliance upon two physicians who were not neurologists and who did not

examine Ms. Pattison constitutes an abuse of discretion under ERISA.

94.    Drs. Hopkins' and Porter's review of Ms. Pattison's records were selective and self-

serving.

95.    Dr. Porter and NMR **were** influenced by their financial relationship with MetLife when

they made the decision to deny Ms. Pattison's claim.

96.    By seeking an independent medical examination more than one year after it terminated

Ms. Pattison's claim, MetLife tacitly acknowledged the arbitrary nature of its

administrative review of Ms. Pattison's claim.

97.    MetLife's refusal to acknowledge Dr. Weiner's examination as independent because he

was chosen by Dr. Blachman and not MetLife to conduct an independent medical review

of Ms. Pattison demonstrates MetLife's bias in evaluating Ms. Pattison's claim.

98.    The self-serving nature of MetLife's decision that Ms. Pattison is capable of her own

occupation is illuminated by the fact that Ms. Pattison's condition has not changed, but in

fact, has only worsened, since MetLife first accepted liability on her claim for benefits.

99.    MetLife has failed to meet its burden of establishing that Ms. Pattison's condition had

changed to such a degree that she was no longer totally disabled under the terms of the

Plan.

100.  MetLife failed to provide Ms. Pattison with a full and fair review of her claim for benefits.

101.  MetLife's delay in disclosing Ms. Pattison's claim file to her upon her written request constitutes evidence of MetLife's failure to abide by the procedural requirements of ERISA and to provide Ms. Pattison a full and fair review of her claim for benefits.

102.  Any discretion to which MetLife may claim it is entitled under the Plan is negated by the procedural deficiencies inherent in its review of Ms. Pattison's claim.

103.  MetLife failed to provide Ms. Pattison a full and fair review of her claim for LTD benefits.

104.  Ms. Pattison remains disabled to this day as a result of the debilitating symptoms of Multiple Sclerosis.

105.  The decision to deny Ms. Pattison's benefits was not supported by the substantial medical evidence contained in the claim file.

106.  The decision to deny Ms. Pattison's benefits was wrongful, unreasonable, irrational, solely contrary to the evidence, contrary to the terms of the Plan and contrary to law.

107.  MetLife was influenced by its financial conflict of interest, as both the administrator of the plan and the payor of benefits thereunder, when it terminated Ms. Pattison's benefits.

108.  Due to the unlawful denial of benefits under ERISA, Ms. Pattison has lost her rightful long-term disability benefits. She has also suffered emotional distress and humiliation as a result of MetLife's actions.

109.  Due to the unlawful denial of benefits under ERISA, Ms. Pattison has also lost the use of her long-term disability benefits.

110. Having exhausted the administrative procedures provided by MetLife, Ms. Pattison now

brings this action.

### FIRST CAUSE OF ACTION
### (Enforcement of Terms of Plan
### Action for Unpaid Benefits)
### (ALL DEFENDANTS)

111. Ms. Pattison realleges each of the paragraphs above as if fully set forth herein.

112. The Plan is a contract.

113. Ms. Pattison has performed all of her obligations under the contract.

114. 29 U.S.C. § 1132(a)(1)(B) states that:

A civil action may be brought ---

(1) by a participant or beneficiary –

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to her under the terms of her plan, to enforce her

rights under the terms of the plan, or to clarify her rights to future benefits

under the terms of the plan.

115. The Defendants' actions constitute an unlawful denial of benefits under ERISA, as

provided in 29 U.S.C. § 1132(a)(1)(B).

116. The Defendants unlawfully denied Ms. Pattison's benefits in part by: (1) rejecting,

without any basis, the substantial evidence supporting Ms. Pattison's claim for disability ;

and (2) denying Ms. Pattison a full and fair review of their decision to deny her benefits.

117.  In accordance with 29 U.S.C. §1132, Ms. Pattison is entitled to be paid benefits under the Plan based upon her disabled status from and after January 2003, and continuing into the present.

118.  The Defendants have refused to provide Ms. Pattison with these disability benefits and is, therefore, in breach of the terms of the Plan and ERISA, which requires that the Defendants engage in a full and fair review of all claims and the administration of the Plan in the best interests of the Plan participants.

119.  As a direct and proximate result of this breach, Ms. Pattison has lost the principal and the use of her rightful LTD benefits.

### SECOND CAUSE OF ACTION
### (Attorneys' Fees and Costs)
### (ALL DEFENDANTS)

120.  Ms. Pattison realleges each of the paragraphs above as if fully set forth herein.

121.  Under the standards applicable to ERISA, Ms. Pattison deserves to recover "a reasonable attorney's fee and costs of the action" herein, pursuant to section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g).

122.  The Defendants have the ability to satisfy the award.

123.  Ms. Pattison's conduct of this action is in the interests of all participants suffering from physical conditions who subscribe to the Plan, and the relief granted hereunder will benefit all such participants.

124.  MetLife has acted in bad faith in denying Ms. Pattison's benefits under the Plan.

125.    The award of attorneys' fees against the Defendants will deter others acting under similar circumstances.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that the Court:

(1)    Declare, adjudge and decree that Ms. Pattison is entitled to ongoing LTD benefits as calculated under the terms of the Plan.

(2)    Award Ms. Pattison the full amount of unpaid benefits under the Plan to which she is entitled, together with such pre-judgment interest as may be allowed by law.

(3)    Order that the Defendants make restitution to Ms. Pattison in the amount of any losses sustained by Ms. Pattison in consequence of the wrongful conduct alleged herein, together with prejudgment interest.

(4)    Award Ms. Pattison the costs of this action and reasonable attorneys' fees; and

(5)    Award such other relief as the court deems just and reasonable.

Date: June 21, 2004                    Respectfully submitted for the Plaintiff,

Mala M. Rafik
BBO No. 638075
ROSENFELD & RAFIK, P.C.
44 School Street, Suite 410
Boston, MA 02108
617-723-7470

20

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

*FILED*
*IN CLERK'S OFFICE*

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)_____ Victoria C. Pattison v. The Hertz Corporation Welfare

    Plan_____ 21 P 4: 12

    *U.S. DISTRICT*
    *DISTRICT OF MASS.*

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
    COVER SHEET.   (SEE LOCAL RULE 40.1(A)(1)).

    ___  I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    _X_  II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,       *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    ___  III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

    ___  IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

    ___  V.     150, 152, 153.



**04 - 11408 DPW**

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
    HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

    _____N/A_____

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
    COURT?

                                                   YES ☐        NO **X**

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
    PUBLIC INTEREST?   (SEE 28 USC §2403)

                                                   YES ☐        NO **X**

    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?

                                                   YES ☐        NO **X**

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
    28 USC §2284?

                                                   YES ☐        NO **X**

7.  DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
    COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
    SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).

                                                   YES **X**        NO ☐

    A.   IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

         EASTERN DIVISION **X**        CENTRAL DIVISION ☐        WESTERN DIVISION ☐

    B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
         GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

         EASTERN DIVISION ☐        CENTRAL DIVISION ☐        WESTERN DIVISION ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME   MALA M. RAFIK _____

ADDRESS _____ ROSENFELD & RAFIK, P.C., 44 SCHOOL STREET, SUITE 410, BOSTON, MA 02108 _____

TELEPHONE NO.   (617) 723-7470 _____

(Pattison Category Form.wpd - 11/27/00)

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

VICTORIA C. PATTISON

**DEFENDANTS**

THE HERTZ CORPORATION WELFARE PLAN, THE HERTZ CORPORATION AND METROPOLITAN LIFE INSURANCE CO.

(b) County of Residence of First Listed Plaintiff __PLYMOUTH__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Mala M. Rafik
Rosenfeld & Rafik, P.C.
44 School Street, Suite 410
Boston, MA 02108
(617) 723-7470

Attorneys (If Known)

*04-11408 DPW*

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- X 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | Injury | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under Equal |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | X 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- x 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

The Plaintiff files this action under ERISA, 29 U.S.C. §1132(a) to recover disability benefits due her under her long-term disability plan administered by Metropolitan Life Insurance Company of America.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE 6.21.04

SIGNATURE OF ATTORNEY OF RECORD *Mala Rafik*

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUN _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____